IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TEXAS MEDICAL TECHNOLOGY INC. F/K/A TEXAS MEDICAL CENTER SUPPLY LLC, | § § § § | |
| Plaintiff, | § § | Civil Action No. 4:22-cv-04254 |
| v. | § § | |
| WESTCHESTER SURPLUS LINES INSURANCE COMPANY, A CHUBB COMPANY, AND SYNDICATE 2623/623 AT LLOYD'S, A BEAZLEY GROUP, | § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, **TEXAS MEDICAL TECHNOLOGY INC. F/K/A TEXAS MEDICAL CENTER SUPPLY LLC**, and files this Original Complaint complaining of Defendants, **WESTCHESTER SURPLUS LINES INSURANCE COMPANY, A CHUBB COMPANY**, and **SYNDICATE 2623/623 AT LLOYD'S, A BEAZLEY GROUP**, and would respectfully show the Court the following:

**I.
PARTIES**

1. Plaintiff Texas Medical Technology Inc. f/k/a Texas Medical Center Supply LLC, ("TMT" or "Plaintiff") is a Texas corporation with its principal place of business in Harris County, Texas.

2. Defendant Westchester Surplus Lines Insurance Company, A Chubb Company, ("Chubb") is a Georgia corporation with its principal place of business in New York, New York.

1

Chubb is an insurance company that does business in the State of Texas, including the Southern District of Texas. Chubb may be served via its designated agent for service of process:

> C T Corporation System
> 289 South Culver Street
> Lawrenceville, GA 30046-4805

or wherever it may be found.

3. Defendant Syndicate 2623/623 at Lloyd's, a Beazley Group, ("Beazley") is an English corporation with its principal place of business in London, England. Beazley is an excess insurance company that does business in the State of Texas, including the Southern District of Texas. Beazley may be served via its designated agent for service of process:

> Lloyd's America, Inc.
> Attn:  Legal Dept
> 280 Park Avenue, East Tower, 25th Floor
> New York, NY 10017

or wherever it may be found.

## II.
## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and complete diversity of citizenship exists.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events and omissions giving rise to the claims and losses at issue occurred within the District, including but not limited to Chubb's and Beazley's adjustments and/or denials of the Claim.

6. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because Chubb and Beazley both reside in and are subject to personal jurisdiction in this District.

## III.
## FACTUAL BACKGROUND

7. This case stems from Defendants' wrongful denial of an insurance claim brought by TMT as a result of defective fabric purchased by TMT for the manufacture of level 3 surgical gowns ("Level 3 Gowns").

8. TMT manufactures, supplies and distributes medical safety equipment including personal protective equipment, such as facemasks, vinyl, latex, nitrile gloves, patient gowns, lab coats, and hand sanitizers. TMT is based in Houston, Texas. Due to the nature of the equipment, their intended use is part and parcel to safety.

9. The Defense Logistics Agency ("DLA"), the agency responsible for procurement of the United States armed forces and related agencies, contracted with an entity called At Ease Sustainment, LLC ("At Ease") for the procurement of Level 3 Gowns (the "DLA Contract").

10. TMT was approved to be a supplier of the Level 3[1] Gowns under the DLA Contract.

11. Pursuant to the FDA:

    11.1 Gowns are examples of personal protective equipment used in health care settings. They are used to protect the wearer from the spread of infection or illness if the wearer comes in contact with potentially infectious liquid and solid material. They may also be used to help prevent the gown wearer from transferring microorganisms that could harm vulnerable patients, such as those with weakened immune systems. Gowns are one part of an overall infection-control strategy.

    11.2 A few of the many terms that have been used to refer to gowns intended for use in health care settings, include surgical gowns, isolation gowns, surgical isolation gowns, nonsurgical gowns, procedural gowns, and operating room gowns. In 2004, the FDA recognized the consensus standard American National Standards Institute/Association of the Advancement of Medical Instrumentation (ANSI/AAMI) PB70:2003, "Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities."

---

[1] https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns.

3

    11.3    New terminology in the standard describes the barrier protection levels of gowns and other protective apparel intended for use in health care facilities and specifies test methods and performance results necessary to verify and validate that the gown provides the newly defined levels of protection:

          **Level 1:** Minimal risk, to be used, for example, during basic care, standard isolation, cover gown for visitors, or in a standard medical unit.

          **Level 2:** Low risk, to be used, for example, during blood draw, suturing, in the Intensive Care Unit (ICU), or a pathology lab.

          **Level 3:** Moderate risk, to be used, for example, during arterial blood draw, inserting an Intravenous (IV) line, in the Emergency Room, or for trauma cases.

    11.4    A surgical gown is a personal protective garment intended to be worn by health care personnel during surgical procedures to protect both the patient and health care personnel from the transfer of microorganisms, body fluids, and particulate matter.[2]

    11.5    The level 3 ANSI/AAMI designation means that the surgical gowns are to be used in moderate risk situations; to provide a barrier to larger amounts of fluid penetration through splatter and more fluid exposure through soaking than Level 2; for use in Arterial blood draw, Inserting an IV, and Emergency Room Trauma.[3]

12.    The ANSI standard documents state the following:

    12.1    In the United States, surgical apparel, surgical drapes, and drape accessories are medical devices and, under the Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of May 28, 1976, are subject to regulation by the U.S. Food and Drug Administration (FDA), including but not limited to FDA requirements for premarket notification (section 510(k) of the Act) and medical device reporting. Barrier efficacy has long been recognized as important in helping to prevent infections and is now mandated by Occupational Safety and Health Administration (OSHA) regulations limiting occupational exposure to bloodborne pathogens (29 CFR 1910.1030). See also the Centers for Disease Control and Prevention's (CDC's) Guideline for the prevention of surgical site infection (CDC, 1999; Mangram, et al., 1999).

    12.2    Surgical gowns, other protective apparel, surgical drapes, and drape accessories are devices intended to promote infection control practices and help protect patients and health care workers. This standard is based on key barrier performance tests that are used to classify the subject products into

---

[2] *Id.*
[3] *Id.*

4

        levels of performance. Knowledge of these defined levels of performance will allow informed and consistent choices about the type of protective product necessary for the situation at hand.[4]

12.3    Health care personnel can be exposed to biological fluids capable of transmitting disease. Those diseases, which are caused by a variety of microorganisms, can pose significant risks to life and health. This is especially true of blood-borne pathogens such as the hepatitis B virus (HBV), hepatitis C virus (HCV), and human immunodeficiency virus (HIV). Patients can also be exposed to microorganisms and other contamination during surgical and other health care procedures. Because engineering controls cannot eliminate all possible exposures, attention is placed on the use of protective apparel, drapes, and drape accessories to reduce the potential for contact with blood, body fluids, OPIM, and microorganisms associated with these materials.

12.4    Health care workers wear protective apparel to help protect both the patient and themselves from the transfer of microorganisms by blood, body fluids, or OPIM. Drapes and drape accessories are also intended to inhibit the transfer of microorganisms and are used to isolate the surgical incision from microorganisms and other contamination.

12.5    This standard addresses the barrier performance of surgical gowns, isolation gowns, other protective apparel, surgical drapes, and drape accessories designed to help preserve the sterile field and/or protect health care workers during surgery and other health care procedures in which exposure to blood, body fluids, and OPIM might be anticipated.[5]

12.6    The barrier performance of a level 3 gown is a critical safety feature and a requirement to prevent the spread of fluid born pathogens between medical provider and patient. The sole purpose of the level 3 gown is personal protection and safety, and the failure of a gown to provide the standard of protection it is designed to provide puts the wearer and patient at risk of contracting serious and/or fatal pathogens.

13.    TMT purchased raw material fabrics provided by Berry Global ("Berry") that were defective. There have been specific lots of the Level 3 Gowns that failed to meet the specifications for Level 3 Gowns performance as documented by testing done by third party laboratories, rendering them unsafe.

---

[4] ANSI/AAMIPB70:2012; Foreword.
[5] ANSI/AAMIPB70:2012; Appendix A.

14. TMT purchased recall insurance from Chubb and is the holder of Chubb Recall Plus™ Consumer Goods Policy No. G71835832 001 (the "Chubb Recall Plus™ Policy" or "Chubb Policy"). The applicable Chubb policy period was from October 26, 2020 until October 26, 2021 and contained $1,000,000 as limits of insurance. A true and correct copy of the Chubb Recall Plus™ Policy is attached hereto as Exhibit A and incorporated into this Complaint.

15. TMT also purchased excess recall insurance from Beazley and is the holder of the Beazley Product Recall Excess Policy No. W2E37F210101 (the "Beazley Recall Excess Policy" or "Beazley Policy"). The applicable Beazley policy period was from March 4, 2021 to March 4, 2022 and contained $2,000,000 as limits of insurance. A true and correct copy of the Beazley Recall Excess Policy is attached hereto as Exhibit B and incorporated into this Complaint.

16. On or about September 21, 2021, the DLA sent a Notice of Termination for Cause letter ("DLA Termination Letter").

17. After receiving the termination letter from the DLA, TMT immediately investigated the issues and determined that there was a covered "insured event" under the Chubb Recall Plus™ Policy and the Beazley Recall Excess Policy.

18. On or about September 23, 2021, TMT notified Chubb and Beazley of the Claim within the applicable policy period. Chubb assigned TMT claim number KY21K281159X ("Claim").

19. On or about October 13, 2021, Defendant Chubb wrongfully denied TMT's Claim. On or about September 29, 2021, Beazley sent a confirmation of receipt of the notice of the Claim. Defendant Beazley did not accept TMT's claim.

20. On or about September 8, 2022, TMT issued a voluntary recall of the Level 3 Gowns under FDA Recall Number 3016808907-9/2/2022-001-R. A true and correct copy of TMT's Recall Letter is attached hereto as Exhibit C and incorporated into this Complaint.

21. The FDA reviewed TMT's action and determined that it meets the formal definition of a "Recall" and classified the health hazard of the defective Level 3 Gowns as a Class II recall. A Class II recall is defined by the FDA as "a situation in which use of or exposure to a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote." A true and correct copy of the FDA's classification report is attached hereto as Exhibit D and incorporated into this Complaint.

## IV.
## APPLICABLE POLICY PROVISIONS

22. The Chubb Policy states the following:

"In consideration of your payment of premium and in reliance upon your statements made in the application form for this policy, as well as the information and material you submitted as part of such application, we agree with you as follows:

We will reimburse you for … "Loss", to which this insurance applies, in excess of the applicable "self-insured retention" up to the Limits of Insurance stated in the Declarations, that is caused by an "insured event" that is first discovered by you during the "policy period" and reported to us in compliance with the provisions of Condition R., (Notice of Loss).[6]

. . .

**"Insured event" means a voluntary, involuntary or mandatory recovery of "stock", market withdrawal or recall, of an "unsafe" "insured product(s)" by or on behalf of its manufacturer, producer, processor, distributor, purchaser, retailer, wholesaler, importer, exporter, wholesaler, importer, exporter, a regularly constituted federal, state or local regulatory or administrative body or user of the "insured product(s)" provided that the use of or exposure to such "insured product(s)" has resulted in or would result in "bodily injury" or "property damage".**[7]

---

[6] Exhibit A, Section 1.
[7] *Id.* at Section 2 F.

7

. . .

"**bodily injury**" means **physical injury, sickness, disease**, or death sustained by a person.[8]

. . .

**"Stock"** means that portion of the lot, batch, production run or other relevant unit of an "unsafe" "insured product(s)" that has not left the direct control of the "insured(s)" or been released for sale or use.

. . .

"**Unsafe**" means a flaw, fault, imperfection, deficiency, hazard, defect, malfunction or inadequacy that **creates a dangerous condition**.[9]

. . .

"Insured Product" means any finished good(s) or product(s) that:

    a) are in production by the "insured(s)"

    b) have been packaged, manufactured, handled or distributed by the "insured(s)" or by any contract manufacturer for the "insured(s)"; or

    c) are being available for sale by the "insured(s)" or are sold on behalf of the insured by any distributor, wholesaler, or retailer."[10]

23.    The Chubb Policy further contained a Replacement Cost Endorsement, which amended the Policy as follows:

"Loss" includes "replacement costs."

"Replacement costs" means:

    1. The total amount of refunds you give to purchasers for the "adulterated" "insured product(s)", not to exceed the initial purchasing price of the goods sold.

    2. The direct costs to repair the "adulterated" "insured product(s)," including the cost to repair unsold stock,

---

[8] *Id*. at Section 2 A.
[9] *Id*. at Section 2 S.
[10] *Id*. at Section 2 G.

8

3. The direct costs to produce or acquire a like replacement product if the "adulterated" "insured product(s)" cannot be repaired,

4. The direct cost of unsold finished stock if the "adulterated" "insured product(s)" cannot be repaired, reconditioned, decontaminated or otherwise treated as to render it marketable.

5. The direct cost related to the removal and installation of the repaired or replaced "adulterated" "insured product(s)."

6. The actual cost to redistribute any restored, repaired or replaced "adulterated" "insured product(s)."[11]

24. The Beazley Policy states the following:

This policy will follow the coverages, terms, representations, warranties, definitions, exclusions, conditions and limitations of the **primary policy**.

## V.
## APPLICABLE CLAIMS

**A.** **TMT's Claim is an Insured Event:**

25. Chubb wrongfully claims that TMT's Claim does not meet the definition of an "insured event" under the Chubb Policy.

26. Under the Chubb Policy, an "insured event" is defined as:

A voluntary, involuntary or mandatory <u>recovery of "stock"</u>, <u>market withdrawal or recall</u>, of an <u>"unsafe" "insured product(s)"</u> by or on behalf of its manufacturer, producer, processor, distributor, or wholesaler of the "insured product(s)" provided that the use of or exposure to such "insured product" has resulted in <u>or would result</u> in "bodily injury" or "property damage."

27. The defective Level 3 Gowns meet the definition of an "insured event." The failure of the surgical gowns to comply with Level 3 Gown standards renders them unsafe and subjects both the wearer of the gown and the patient to a serious risk of bodily injury or death, as indicated

---

[11] *Id*. at Chubb Replacement Costs Endorsement (effective date of October 26, 2020).

by both the FDA and ANSI.[12] Hence, the gowns' inability to adequately block bodily fluids and fluid borne pathogens renders them unsafe.

28. As a result, TMT voluntarily recovered the stock and issued a recall of the unsafe insured product from the market and its customers because of a serious health and safety issue, as indicated by the FDA and ANSI, which is an "insured event" under the Chubb Policy.

29. Furthermore, the Chubb Recall Plus™ Policy's definition of an "insured event" includes the phrase "would result." However, the Policy does not provide a definition of "would result" to determine its meaning in relation to an "insured event."

30. An insurance policy's terms are given their ordinary and generally accepted meaning, unless the policy shows the words were meant in a technical or different sense. The ordinary meaning of "would" in a sentence is used to "function in the conclusion of a conditional sentence to express a contingency or possibility." Thus, under the ordinary and generally accepted meaning of "would result," the defective Level 3 Gowns meets the definition of an "insured event" due to the possible risk of bodily injury to users.

31. Therefore, the defective Level 3 Gowns qualifies as an "insured event" under the terms of the Chubb Recall Plus™ Policy. Accordingly, TMT is entitled to various insurance benefits as a result of the "insured event," including, but not limited to, the duty to pay benefits due.

**B.**  **The Defective Level 3 Gowns are Unsafe:**

32. Furthermore, Chubb wrongfully claims that the Level 3 Gowns are not "unsafe" because such gowns could be used in low risk Level 2 situations without an expectation of bodily injury.

---

[12] https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/medical-gowns; ANSI/AAMIPB70:2012 (Foreword); ANSI/AAMIPB70:2012 (Appendix A).

33. However, Chubb's argument is misguided because the defective gowns are sealed, sterilized, and labeled as Level 3. Unlike Level 2 gowns, Level 3 gowns must be used in moderate risk situations because the threat of bodily injury or death is much higher than in Level 2 situations, as indicated by the FDA and ANSI.[13]

34. The Level 3 packaging will mislead users to believe that they are receiving adequate health and safety protection in Level 3 situations.

35. As a result, use of the defective Level 3 Gowns would (1) not provide adequate protection, (2) pose a serious health and safety risk, and/or (3) result in bodily injury. A single bodily injury claim from pathogen exposure due to lack of Level 3 protection would expose TMT to substantial liability.

36. Moreover, under the Chubb Recall Plus™ Policy, TMT is also entitled to coverage under the "Replacement Costs Endorsement" (the "Endorsement") that provides coverage for adulterated gowns.[14] The Endorsement includes coverage for:

> (1) refunds given to purchasers of the "adulterated" "insured product(s)", (2) the direct costs to repair the "adulterated" "insured product(s)," including the cost to repair unsold stock, (3) the direct costs to produce or acquire a like replacement product if the "adulterated" "insured product(s)" cannot be repaired, (4) the direct cost of unsold finished stock if the "adulterated" "insured product(s)" cannot be repaired, reconditioned, decontaminated or otherwise treated as to render it marketable, (5) the direct cost related to the removal and installation of the repaired or replaced "adulterated" "insured product(s)", and (6) the actual cost to redistribute any restored, repaired or replaced "adulterated" "insured product(s)."

37. The Chubb Recall Plus™ Policy does not provide a definition of "adulterated." Thus, the plain and ordinary meaning of the word applies, which is a failure to accomplish its intended purposes or not as intended.

---

[13] *Id.*
[14] *See* Exhibit A, Replacement Costs Endorsement.

11

38.     The Level 3 Gowns are adulterated due to a manufacturing defect rendering the gowns unsafe. Therefore, the defective Level 3 Gowns are covered by the Endorsement entitling TMT to the cost to repair, replace, remove and redistribute the insured product.

39.     TMT acted in accordance with the provisions of the insurance contract with Chubb and fulfilled its obligations to provide timely notice of the insured event. Chubb failed to fulfill its obligations pursuant to the provisions of the insurance contract by wrongfully denying coverage in breach of the Chubb Recall Plus™ Policy.

40.     Despite TMT's demands for Chubb, to fulfill its obligations under the insurance contract, Chubb has refused.

41.     TMT is entitled to coverage under the Chubb Recall Plus™ Policy.  TMT's damages exceed the Chubb Policy limits of $1,000,000 and exceed Beazley's Policy limits of $2,000,000, entitling TMT to coverage under both the Chubb and Beazley Policies.

## VI.
## CAUSES OF ACTION

**A.     COUNT ONE: BREACH OF CONTRACT - CHUBB**

42.     TMT re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

43.     TMT and Chubb entered into the Chubb Recall Plus™ Policy, a valid and enforceable insurance contract.

44.     TMT is an insured under the Chubb Recall Plus™ Policy.

45.     The purpose of the Chubb Recall Plus™ Policy is to provide TMT with insurance coverage in the event TMT's gowns are recalled.

46.     Due to the failure of the Level 3 Gowns, TMT timely submitted a claim for coverage under the Chubb Recall Plus™ Policy.

47. Under the Chubb Recall Plus™ Policy, TMT is entitled to coverage if the Policy's definition of an "insured event" is met.

48. As stated above, the defective Level 3 Gowns satisfies the Policy's definition of an "insured event." The manufacturing defect of the gowns renders them unsafe and subjects both the wearer of the gown and the patient to a serious risk of bodily injury or death, as indicated by both the FDA and ANSI. Hence, the gowns' inability to adequately block bodily fluids and fluid borne pathogens renders the gowns unsafe.

49. Therefore, TMT experienced an "insured event" triggering Chubb's duties under the Chubb Recall Plus™ Policy to pay TMT insurance coverage benefits due in connection with the insured event.

50. Furthermore, as stated above, TMT is also entitled to coverage under the Replacement Cost Endorsement because the Level 3 Gowns are adulterated due to a manufacturing defect rendering the gowns unsafe. Thus, under the Endorsement, TMT is entitled to the cost to repair, replace, remove and redistribute the defective Level 3 Gowns.

51. TMT has complied with all applicable provisions of the Chubb Recall Plus™ Policy, including providing timely notice to Chubb of an insured event.

52. TMT has satisfied all conditions that exist under the Chubb Recall Plus™ Policy, or such conditions have been waived by Chubb.

53. Chubb wrongfully denied TMT's claim for insurance coverage benefits in connection with the insured event, thereby breaching its insurance contract with TMT.

54. As a direct and proximate result of Chubb's denial of TMT's claim, TMT has been deprived of the benefits of the Chubb Recall Plus™ Policy, as well as the benefits of the Beazley Recall Excess Policy.

55. As a result, TMT has incurred damages, the amount of which shall be determined at trial, plus pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

**B.    COUNT TWO: BREACH OF CONTRACT - BEAZLEY**

56. TMT re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

57. TMT and Beazley entered into the Beazley Policy, a valid and enforceable insurance contract.

58. TMT is an insured under the Beazley Policy.

59. The purpose of the Beazley Policy is to provide TMT with excess insurance coverage in the event TMT's gowns are recalled.

60. Due to the failure of the Level 3 Gowns, TMT timely submitted a claim for coverage under the Beazley Policy.

61. Under the Beazley Policy, TMT is entitled to coverage if the Policy's definition of an "insured event" is met.

62. TMT has complied with all applicable provisions of the Beazley Policy, including providing timely notice to Beazley of an insured event.

63. TMT has satisfied all conditions that exist under the Beazley Policy, or such conditions have been waived by Beazley.

64. Beazley has not paid TMT insurance benefits in connection with the insured event, thereby breaching its insurance contract with TMT.

65. As a result, TMT has incurred damages, the amount of which shall be determined at trial, plus pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## C.    <u>COUNT THREE: CHAPTER 542 OF THE TEXAS INSURANCE CODE</u>

66. TMT re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

67. Under § 542.003 of the Texas Insurance Code:

(a) An insurer engaging in business in this state may not engage in an unfair claim settlement practice.

(b) Any of the following acts by an insurer constitutes unfair claim settlement practices:

(1) knowingly misrepresenting to a claimant pertinent facts or policy provisions relating to coverage at issue;

(2) failing to acknowledge with reasonable promptness pertinent communications relating to a claim arising under the insurer's policy;

(3) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the insurer's policies;

(4) not attempting in good faith to effect a prompt, fair, and equitable settlement of a claim submitted in which liability has become reasonably clear;

(5) compelling a policyholder to institute a suit to recover an amount due under a policy by offering substantially less than the amount ultimately recovered in a suit brought by the policyholder;

(6) failing to maintain the information required by Section 542.005; or

(7) committing another act the commissioner determines by rule constitutes an unfair claim settlement practice.

68. TMT has made a claim under the Chubb Recall Plus™ Policy and Beazley Policy for its insurance coverage benefits in connection with the insured event and has satisfied all conditions under both Policies. TMT gave proper notice of its Claim to Chubb and Beazley. TMT's Claim constitutes a first-party claim.

69. Chubb and Beazley are liable to TMT for all insurance coverage benefits due under the Chubb Recall Plus™ Policy and the Beazley Policy in connection with TMT's Claim.

70. Chubb and Beazley violated Chapter 542 of the Texas Insurance Code by wrongfully rejecting TMT's valid Claim and failing to timely pay TMT's loss in connection with its Claim.

71. Consequently, TMT is entitled to the damages set forth in § 542.060 of the Texas Insurance Code including, in addition to reasonable and necessary attorney's fees, interest at a rate of eighteen percent (18%) per annum, as well as any and all other relief provided therein.

### D. COUNT IV: ATTORNEY'S FEES

72. TMT re-alleges and incorporates by reference the preceding paragraphs for all purposes as if set forth fully herein.

73. TMT sent Chubb demand for payment of its Claim more than 30 days prior to filing suit, but Chubb refused payment. TMT was forced to retain the undersigned counsel.

74. Additionally, TMT has made a claim to Beazley for payment more than 30 days prior to filing suit, but payment has not been made.

75. Pursuant to Texas Civil Practices and Remedies Code §38.001 and Texas Insurance Code § 542.060, TMT is entitled to an award of its reasonable and necessary attorneys' fees in an amount to be established at trial.

## VII.
## JURY TRIAL DEMAND

76. TMT demands a jury trial pursuant to Fed. R. Civ. P. 38.

## VIII.
## PRAYER

WHEREFORE, TMT respectfully requests this Court grant it the following relief:

a. Judgment awarding TMT all damages it has suffered as a result of Chubb's breach of the Chubb Recall Plus™ Policy;

b. Judgment awarding TMT all damages it has suffered as a result of Beazley's breach of the Beazley Policy;

c. Judgment awarding TMT all damages sustained as a result of Chubb and Beazley's violations of Chapter 542 of the Texas Insurance Code;

d. Judgment awarding TMT all reasonable and necessary attorneys' fees and expenses incurred in this matter under Section 38.001 of the Texas Civil Practice & Remedies Code and/or Chapter 542 of the Texas Insurance Code;

e. Judgment awarding TMT pre-judgment and post-judgment interest in the amount allowed by law;

f. Judgment awarding TMT all costs of court; and

g. Such other and further relief as is equitable and just, both at law and in equity, as TMT may show itself justly entitled.

Respectfully submitted,

**THE SHEENA LAW FIRM**

By: /s/ *Danny M. Sheena*
DANNY M. SHEENA, P.E.
State Bar No. 00792830
JASON P. SCOFIELD
State Bar No. 24060578
MEGAN D. SHEENA
State Bar No. 24132004
2500 W. Loop South, Suite 518
Houston, Texas 77027
(713) 224-6508
(713) 225-1560 Facsimile
Service@Sheenalawfirm.com

**ATTORNEYS FOR PLAINTIFF,
TEXAS MEDICAL TECHNOLOGY INC.
F/K/A TEXAS MEDICAL CENTER
SUPPLY LLC**

17

**HAYNES AND BOONE, LLP**

By: /s/ *David P. Bender Jr.*
DAVID P. BENDER JR.
(*pro hac vice pending*)
Lead Attorney
State Bar No. 123976
6000 Headquarters Drive, Suite 200
Plano, Texas 75024
(972) 739-6900
(972) 680-7551 Facsimile
david.bender@haynesboone.com

JOSEPH G. BALICE
(*pro hac vice pending*)
600 Anton Boulevard, Suite 700
Costa Mesa, California 92626
(949) 202-3000
(974) 202-3001 Facsimile
joseph.balice@haynesboone.com

BRIAN E. SINGLETERRY
State Bar No. 24098433
301 Commerce Street, Suite 2600
Fort Worth, Texas 76102
(817) 347-6600
(817) 347-6650 Facsimile
brian.singleterry@haynesboone.com

**ATTORNEYS FOR PLAINTIFF,
TEXAS MEDICAL TECHNOLOGY INC.
F/K/A TEXAS MEDICAL CENTER
SUPPLY LLC**